IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 4, 2001 Session

**STATE OF TENNESSEE v. RAYMOND GRIFFIN**

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 98-09629,30,31      Joseph B. Dailey, Judge**

---

**No. W2001-01332-CCA-R3-CD - Filed March 15, 2002**

---

The Appellant, Raymond Griffin, was convicted after a trial by jury of twenty-five offenses; two especially aggravated kidnappings, sixteen aggravated robberies, five aggravated burglaries, and two aggravated assaults. Griffin received an effective two-hundred and seventy-year sentence. On appeal, Griffin raises the following issues for our review: (1) whether the trial court erred in admitting his statements into evidence; (2) whether the trial court erred in joining the eight separate criminal episodes for trial; (3) whether the confinement of the victims was essentially incidental to accomplishment of the aggravated robberies and, therefore, sufficient to support separate convictions for especially aggravated kidnapping; (4) whether the evidence was sufficient to support his convictions; and (5) whether the trial court erred in ordering him to serve his sentences consecutively. After review, we find that the trial court erred in joining the eight criminal episodes for trial; however, such error was harmless. We also reverse and dismiss one conviction for especially aggravated kidnapping because the confinement of the victim was essentially incidental to the accomplishment of the aggravated robbery, thereby reducing Griffin's sentence to an effective two-hundred and forty years. Griffin's remaining issues are without merit. Accordingly, the judgments of the Shelby County Criminal Court in all other respects are affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Reversed and Dismissed in Part and Affirmed in Part.**

DAVID G. HAYES, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. GARY R. WADE, P. J., filed a concurring and dissenting opinion.

Harry E. Sayle III, Memphis, Tennessee, for the Appellant, Raymond Griffin.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; P. Robin Dixon, Jr., Assistant Attorney General; William L. Gibbons, District Attorney General; and Charles Bell and Lorraine Craig, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## Factual Background

The thirty-two indictments against the Appellant stem from eight separate criminal episodes spanning a six-week period. The respective convictions arising from each criminal episode are set forth in the attached Appendix.

**1. December 4, 1997:** Michael Coleman drove Linda Anderson home after work. Both went inside the Anderson home to retrieve a vacuum cleaner. As Coleman was exiting the home, a masked man "ran away from behind the bushes," and pointed a handgun at Coleman. A second armed and masked man appeared, and Coleman was forced back inside the home. Once inside, Coleman and Linda Anderson were ordered to lie down on the den floor. During this time, the robbers were continuously demanding money. Debbie Anderson, Linda's cousin, who was sitting on the couch with her two-year-old son, was forced to her bedroom to retrieve her purse. One of the robbers then proceeded upstairs where he encountered Classie Anderson, Linda' mother. Classie was instructed not to get out of bed. Also present in the home was Camilla Anderson, Linda's daughter. Camilla heard screaming coming from the den and hid in her bedroom closet, where she phoned 911. The robbers stole jewelry from Debbie and Classie, Debbie's purse, Linda's coin purse, Classie's billfold, and Coleman's 1995 Dodge Neon. Before the robbers left the home, they forced everyone into a bathroom or closet, and threatened to shoot anyone who came out. None of the victims could identify either of the intruders. The Appellant later confessed to committing the robbery with Tyrone Taylor.

**2. December 20, 1997:** Tina Lorraine Hill traveled with her two children, Michael and Allen, to Memphis from Louisville, Mississippi. About 1:15 a.m., she arrived at the home of George Cooley and his two children, Craig and Julie. Hill was opening the trunk of her car when a man wearing a ski-mask and carrying a handgun ordered her back in the vehicle. A second man, also wearing a mask and carrying a handgun, came around the car to get the children. The men demanded to go inside the Cooley home. Once inside the home, Hill was forced to stay in the living room with the children. One of the robbers took Cooley through the house, in order for Cooley to show him where items of value were located. The robbers stole a 20-gauge Sears and Roebuck shotgun, a television, a VCR, checkbooks, Cooley's wallet, Cooley's keys, an ATM card, a telephone, and shotgun shells. No identification of the Appellant was made, but Hill identified the Appellant's co-defendant as one of the robbers. A gun similar to the one taken from Cooley's home was discovered during a search of the Appellant's residence, and was tentatively identified by Cooley at trial. No confession was obtained from the Appellant.

**3. December 23, 1997:** Kecia Coleman drove her sister, Carmen Coleman, home from the beauty shop. Kecia remained in the car, while her sister went to the door. A car pulled into the driveway behind Kecia's car, and three men wearing ski-masks and carrying guns exited the vehicle. One man approached Carmen, grabbed her, and put a gun in her face. Kecia began to blow the car horn. At this time, Corrine Coleman, Kecia and Carmen's mother, heard the horn and opened the front door.

Carmen was forced inside at gunpoint. Kecia was struck on the head and lost consciousness. Kecia was then dragged inside the home, and taken to the kitchen, where her mother and sister had been forced to lay face-down on the floor. The robbers stole Kecia's Mazda 626, three televisions, two cell phones, a portable headset telephone, jewelry, a VCR, all three women's purses, and Christmas gifts inside the home. No one could identify any of the robbers. The Appellant later confessed to committing the robbery with Tyrone Taylor and Cameron Buchanan. Two televisions, a VCR, two cell phones, Corrine's wallet, and Kecia's coat were later recovered during searches of the Appellant's and his co-defendants' residences.

4. **December 27, 1997:** Willester Clark, his wife, Jean, and two of their daughters, Sybil and Menthia, returned home from a party. Jean waited in the car, while the others went to unlock the door. As they were unlocking the door, two men and a woman, all wearing ski-masks and carrying guns, came "running from around the side of the house." The Clarks were forced into the den of their home at gunpoint and ordered to kneel on the floor. Leslie Clark, the eldest daughter, was inside sleeping. One of the robbers went to the back of the house, pulled Leslie out of bed and brought her into the den with the others. While the robber was in the back of the house with Leslie, a shot was fired; no one was injured. After all the Clarks were gathered in the den, they were robbed of their personal items: purses, a wallet, jewelry, a coat, and a camera. The Clarks were then led into the bathroom and instructed not to come out. The robbers searched the house, taking luggage, clothing, and Christmas gifts. One of the robbers returned to the bathroom and asked for the keys to the Clark's car. The robbers left the home in a white vehicle and the Clarks' car. Early that same morning, the Clarks received a phone call. The person on the phone asked to speak with Menthia, and said his name was Tyrone. Willester refused to let the person speak with Menthia, and the person then threatened to return to the home if his request was not granted. The police were again called to the Clark home. The white vehicle was identified at trial by members of the Clark family as similar to the one used by the robbers. Sybil Clark identified the Appellant in a photograph line-up. No one, other than Sybil, could identify the Appellant; however, Sybil, Menthia, and Willester, all identified Tonjala Woodears as the woman involved in the robbery. The Appellant admitted to committing the crime with Tyrone Taylor and Tonjala Woodears.

5. **January 3, 1998:** Around 1:30 in the morning, Lindsey Wilson drove John White home. They were sitting in the driveway talking, when a man wearing a ski-mask and carrying a shotgun ordered them out of the car. White "started jumping out of the other side" of the vehicle, and the man ran around the vehicle to stop him. A woman, wearing a ski-mask and holding a gun, yanked Wilson out of the car, threw her to the ground, began to kick her, and then "pulled" her to the porch. The robbers took White's wallet and car keys, and asked for the pin numbers to his credit cards. White and Wilson were then instructed to "go to the backyard." The female robber attempted to take Wilson's vehicle, but failed. The Appellant later admitted to committing the crime with Tonjala Woodears. The assailants could not be identified by the victims.

6. **January 6, 1998:** Larry Smith drove home from work. A car moved into his driveway, blocking his truck. Three men, wearing ski-masks and carrying guns, forced Smith from his vehicle. Smith had difficulty opening the door, and one of the robbers said, "shoot him." Once inside the home,

Smith was ordered to lie down on the floor and tied up with clear duct tape. The robbers stole two television sets, three VCRs, Smith's wallet, a stereo system, and Smith's red truck. The Appellant admitted to committing the crime with Tyrone Taylor and Cameron Buchannon. Smith could not identify any of the intruders. Two televisions, a VCR, and the stereo system were later recovered during searches of the Appellant's and his co-defendants' residences.

**7. January 14, 1998:** Zernia Peacock returned home from a YMCA board meeting, when a red truck pulled into her driveway. A masked, armed man exited the truck and demanded her purse. She told him it was in her car. She was then forced inside her home, and ordered to sit in a chair. A masked woman, who was holding a machete, then entered the home carrying Peacock's purse. The woman watched over Peacock, while the man searched the home. After several minutes, the man returned to Peacock, placed a shotgun between her eyes, and demanded money. She replied that there was no money in the home, and was then led into a bedroom. The robbers took credit cards, a jacket, a watch, and a camcorder. The Appellant later admitted to committing the crime with Tonjala Woodears. Peacock could not identify any of the intruders; however, she did identify a jacket found in the Appellant's closet as similar to the one he wore during the robbery.

**8. January 14, 1998:** Later on January 14th, Teresa Davis Wampler arrived at home and was unloading groceries from her vehicle, when a red truck pulled into her driveway, blocking her vehicle. When the truck light came on, Wampler saw two black males in the front seat and another person on the passenger side holding a machete. She began to run towards her neighbor's house. The driver of the truck, who was carrying a shotgun, got out of the vehicle and chased her. Wampler stumbled and fell. The man picked up her purse, and then returned to the truck. Wampler made an identification of the Appellant and the red truck. The Appellant later admitted to the crime.

Wampler's neighbor, John Ables, was awakened by Wampler's screams and jumped out of bed to see what was going on. At trial, Ables testified:

> I jumped up, and ran towards the front of my house in my living room, and I've got windows all in my living room, and I saw Ms. Davis and a gentlemen in my front yard, struggling. And they hit the monkey grass, and she fell, and he swung at her and missed her, and then he fell on top of her. And by then she was crawling up to the porch, and I approached the door, went out, and he saw me, and I started to chase him across my neighbor's yard.

He pursued the assailant until the assailant got into the red truck and pointed the shotgun at Ables. At trial, Ables identified the shotgun admitted into evidence, as looking like the one he saw that night. Ables could not identify the assailant.

Shotgun shells, three ski-masks, a sawed-off shotgun and that portion of the barrel that was sawed-off were found at the Appellant's residence. Also, a Crossman air pistol and two pairs of gloves were found in the Appellant's car. On August 6, 1998, the Shelby County Grand Jury returned thirty-two indictments against the Appellant; which consisted of 6 aggravated burglaries,

4 aggravated assaults, 17 aggravated robberies, and 5 especially aggravated kidnappings. The State filed a motion to consolidate all of the indictments for trial, which was later granted. After a jury trial, the Appellant was convicted of 25 offenses: 2 especially aggravated kidnappings, 16 aggravated robberies, 5 aggravated burglaries, 2 aggravated assaults. He was found not guilty of all offenses charged in the December 20th episode. The Appellant received an effective two-hundred and seventy-year sentence. The Appellant's motion for a new trial was denied, and this timely appeal followed.

## ANALYSIS

### I. Suppression of the Appellant's Statements

First, the Appellant argues that the trial court erred in denying his motion to suppress statements given during the period after his arrest. The standard of review applicable to suppression issues is well established. In reviewing a denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the prevailing party. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility of witnesses, determining facts, and resolving conflicts in the evidence. *Id.* Indeed, these findings will be upheld unless the evidence preponderates otherwise. *Id.*

In the present case, the trial court admitted the statements into evidence, and made the following findings:

> And when comparing the credibility of the two police officers that testified against the credibility of this man with his six prior convictions and his evasive demeanor on the witness stand and his calculating answers that changed as required in the cross-examination, and the cold, hard facts that were presented with his voice on the tapes and his signatures on the documents, there's no question in my mind that all these statements were given freely and voluntarily.

Inherent in the admissibility of the written statement is that the statement was voluntarily given by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. *See Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624 (1966); *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992), *cert. dismissed*, 510 U.S. 124, 114 S. Ct. 651 (1993). The Appellant contends that his statements should not have been admitted into evidence because the statements were given involuntarily, under duress, and without the advice of counsel, in violation of his constitutional rights. The Appellant, in his brief, contends that he was without food and sleep for twenty-two hours. At the suppression hearing, the Appellant testified that after he denied involvement in the crimes, one of the interrogating officers became violent, kicking chairs and doors. Specifically, the Appellant argues that

the statements were not voluntarily given, but were given under duress and in return for assurances that the interrogating officers would not prosecute his live-in girlfriend who was pregnant with his child, would not charge him with murder in some unsolved murder, and would not turn the case over to the Federal government for prosecution under the federal carjacking statute and felon-in-possession-of-firearm statute.

In order for a confession to be admissible, it must be freely and voluntarily made; "that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting *Bram v. United States*, 168 U.S. 532,542-43, 18 S. Ct. 183, 187 (1897)). In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole. *Id.* A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. *Id.* (citations omitted). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id.* (citations omitted). The focus of the reviewing court should be "whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth." *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961)).

Although the Appellant made allegations of coercion and intimidation by his interrogators, the trial court failed to accredit his claims. Instead, in finding the statement voluntary, the court relied upon the testimony of Sergeant Goods, the signed waiver of rights forms, and the waivers contained in each of the Appellant's inculpatory statements. We find that the record fails to establish that law enforcement exercised any compelling influence over the Appellant or that his statements were induced by promises made by Sergeant Goods. Furthermore, the record indicates that the Appellant was advised fully and completely of his Miranda rights, and at no time did the Appellant indicate that he did not understand his rights. The trial court obviously accredited the testimony of Sergeant Goods in finding a valid and knowing waiver of rights and finding a voluntary statement made from the free will of the Appellant.

The trial court's determination that a confession was given knowingly and voluntarily is binding on this court unless the Appellant can show that the evidence preponderates against the trial court's ruling. *State v. O'Guinn*, 709 S.W.2d 561, 566 (Tenn.), *cert. denied*, 479 U.S. 871, 107 S. Ct. 244 (1986). We find no reason to disregard the findings of the trial court with respect to the voluntariness of the Appellant's statement. We conclude that the trial court's denial of the motion to suppress was proper.

## II. Joinder of the Eight Separate Criminal Episodes for Trial

Second, the Appellant argues that the trial court improperly joined the eight criminal episodes for trial. On appellate review, this court will not reverse a trial court's decision concerning

permissive joinder and severance of offenses absent an abuse of the trial court's discretion. *Spicer v. State*, 12 S.W.3d 438, 442 (Tenn. 2000) (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). Accordingly, this court will not interfere with a trial court's ruling unless the "court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* at 442-43 (citations omitted). Whether severance should be granted "depends upon the facts and circumstances involved in the various crimes charged." *State v. Morris*, 788 S.W.2d 820, 822 (Tenn. Crim. App.), *perm. to app. denied* (Tenn. 1990). The trial court is required to hold a pretrial hearing to determine the appropriateness of joinder, consolidation, or severance. *State v. Hoyt*, 928 S.W.2d 935, 944-45 (Tenn. Crim. App. 1995). The court must make a determination that (1) the multiple offenses constitute parts of a common scheme or plan; (2) the evidence of one offense is relevant to a material issue, other than character, in the trial of all the other offenses, and (3) the probative value of the evidence outweighs any prejudicial effect. *Spicer,* 12 S.W.3d at 445.

In the present case, the trial court permitted joinder, finding that the 32 indictments were part of a "larger, continuing plan or conspiracy," and that evidence of each offense would be admissible upon trial of the others, in order to show identity and lack of mistake. Specifically, the trial court made the following findings:

> But if you look - if you step back and look at all of them, then it becomes apparent to me, at least, that while it's true that on any given day they were riding around looking for someone to rob, they didn't just happen to be out there by coincidence that day, randomly thrown together looking to commit a robbery; that the fact that they were committing these over and over and over again - same group of people involved, to varying degrees, the same type of robbery, the same driveway robbery, the same proceeds that were sought and taken, the same proceeds that were shared to one degree or another by everybody involved - they'd commit one, and then a day or two later they'd be out committing another one and then another one in the same fashion, essentially - obviously not in the identical fact-by-fact one-hundred percent fashion, but essentially in the same fashion, over and over.
>
> I think the conclusion is inescapable that this was a common plan by these people to go out and commit these types of robberies over and over. It didn't just happen.

The Appellant argues that the trial court "abused its discretion in consolidating these indictments for one trial." The Appellant further asserts that the "prejudicial impact of having eight criminal episodes tried together far outweighs any probative value evidence of other crimes would have."

Two or more offenses may be joined if they "constitute parts of a common scheme or plan or if they are of the same or similar character." Tenn. R. Crim. P. 8(b). Three categories of such evidence are recognized:

(1) distinctive designs or signature;

(2) larger, continuing plan or conspiracy; and

(3) same transaction.

*State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993), *perm. to app. denied* (Tenn. 1994).

A defendant has a right to sever such permissively joined charges unless the trial court determines that:

(1) the offenses are part of a common scheme or plan; and

(2) evidence of one would be admissible upon the trial of the others.

Tenn. R. Crim. P. 14(b)(1); *Spicer*, 12 S.W.3d at 443; *Hallock*, 875 S.W.2d at 289.

Pursuant to Rule 14(b)(1) review, we must first find that there was evidence of a common scheme or plan. "A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." *Hallock*, 875 S .W.2d at 289. Generally, evidence that the accused committed crimes independent of those for which he is on trial is inadmissible because it lacks relevance and invites the finder of fact to infer guilt from propensity. *Id.* at 290. Under certain circumstances, however, such evidence may be relevant to prove a genuinely contested issue other than propensity. *Id.* Although Tennessee Rule of Evidence 404(b) does not enumerate such circumstances, they may include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, and "a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other." *Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975).

The trial court joined the eight criminal episodes, and denied severance finding a "larger, continuing plan or conspiracy." In order for each offense to be part of a "larger, continuing plan or conspiracy," proof of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial is required. *Hoyt*, 928 S.W.2d at 943. "The unifying concept of crimes admitted under this theory is not their high degree of similarity but the common goal or purpose toward which each crime is directed." NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 404.11 (3d ed. 1995); *see Hallock*, 875 S.W.2d at 290.

We conclude that there is not a "larger, continuing plan or conspiracy" such as to satisfy the "common scheme or plan" requirement of the severance test. Upon examination of the record, we find no proof which indicates that the Appellant and his co-defendants had a working plan, operating towards the future. There was not a common goal or purpose toward which each crime was directed. The State argues that "the record reveals that the defendant's offenses were part of a common scheme or plan to drive around the City of Memphis at night in order to target particular individuals

for robbery."[1] *Hallock* provides the following relevant example: "X is on trial for three counts of burglary, each involving a different building, a different form of entry, and a different day. His overall purpose, however, was to acquire money for college. Clearly, without more, X is entitled to severance under Rule 14(b)(1)." *Hallock*, 875 S.W. 2d at 290. In accord with *Hallock*, we conclude that in the absence of a unifying common goal or purpose which connect the individual robberies and accompanying crimes, other than simply the perpetration of multiple offenses, the Appellant is entitled to severance of the eight criminal episodes. Because we find that no "common on scheme or plan" existed, it is unnecessary to proceed to the second requirement of the severance test, *i.e.,* the admissibility of the evidence of one crime upon the trial of the others.

Having concluded that it was error for the eight criminal episodes to be consolidated into a single trial, we must next determine whether such consolidation constituted reversible error, requiring new trials to be ordered. For reversal, the Appellant must show that the error "affected the result of the trial of the merits." Tenn. R. Crim. P. 52(a). "In most severance cases, the line between harmless and prejudicial error is in direct proportion to the degree by which proof exceeds the standard required to convict." *Spicer*, 12 S.W.3d at 447 (citations omitted). In this case the proof exceeded by a wide margin the reasonable doubt standard required to convict. The Appellant had confessed to seven of the eight criminal episodes. The crimes were committed in a similar fashion, by a similar group of people. The evidence of guilt in all seven cases was overwhelming. Furthermore, the Appellant was not convicted of the criminal episode for which there was no confession. We, therefore, conclude that improper joinder of all eight criminal episodes was harmless error.

### III. Separate Convictions for Especially Aggravated Kidnapping

Third, the Appellant argues that the facts do not support convictions for both especially aggravated kidnapping and aggravated robbery because any confinement of Kecia Coleman (December 23rd episode) or Larry Smith (January 6th episode) was essentially incidental to the primary purpose of committing the aggravated robberies, and therefore, separate convictions violate due process principles and the mandate of *State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991). Specifically, the Appellant argues that he did not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself. The Appellant, in his brief, relies upon the following facts and circumstances in support of his argument:

> In this case, during the robbery of Larry Smith, Mr. Smith was accosted at gunpoint and ordered to move from his truck in his driveway into his house. He was told to lie on the floor, and was bound with duct tape while he was robbed of two televisions, three VCRs, a stereo set, his wallet, and his truck. He was physically unhurt, and the incident lasted only as long as it took for the assailants to take the items mentioned. The movement was only a short distance – from the driveway to

---

[1] The State essentially agues that the *modus operandi* of each robbery was so distinctive as to be like a signature. The trial court found this argument to be without merit. We agree.

the house – and was clearly necessary to accomplish the burglary and robbery. The confinement was essentially incidental to the robbery of Larry Smith, and clearly did not increase the risk of harm to him.

During the robbery of Kecia Coleman, the victim was knocked unconscious when she started blowing her car horn. She was taken into the house where the other victims were while the robbery was taking place. The movement and confinement was essentially incidental to the burglary and robbery, and did not increase the risk of harm to the victim.

The appellate courts of this state have recognized that inherent in every assault, robbery, and, rape is a period of confinement or restraint. Thus, the courts are left to determine "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not . . . sufficient to support a separate conviction for kidnapping . . . in and of itself." *Id.* (citation omitted). The focus of an *Anthony* inquiry is upon the "purpose of the removal or confinement and not the distance or duration." *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997). If the purpose of the removal or confinement was not necessary for the commission of the underlying felony, the kidnapping is not incidental to the other offense. *Id.* If the "movement or confinement was beyond that necessary to consummate the [underlying offense,] . . . the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Id.* (citing *Anthony*, 817 S.W.2d at 306). Affirmative answers to these inquiries support affirmance of a contemporaneous kidnapping. *See, e.g., Dixon*, 957 S.W.2d 532.

During the robbery, Kecia Coleman was hit on the head and knocked unconscious because she continued to blow the car horn. Applying the foregoing principles, we first conclude that the purpose of confinement was not necessary for the commission of the robbery. Second, we find that the additional confinement prevented the victim from summoning help, lessened the Appellant's risk of detection, and created a significant danger or increased the victim's risk of harm. Accordingly, separate convictions for especially aggravated kidnapping and aggravated robbery in the case of Kecia Coleman are proper.

In the case of Larry Smith, we conclude that separate convictions for especially aggravated kidnapping and aggravated robbery violate due process principles and the mandate of *State v. Anthony*. The act of binding Smith's hands with duct tape was essentially incidental to accomplishing the armed robbery. *State v. Sanders*, 842 S.W.2d 257, 260 (Tenn. Crim. App. 1992); *see also State v. Blouvet*, 965 S.W.2d 489, 492 (Tenn. Crim. App. 1997). While binding Smith's hands may have increased the risk of harm, this risk was not substantially greater than that necessarily inherent in the robbery. *Id.* Accordingly, the Appellant's conviction for especially aggravated kidnapping involving the victim Larry Smith, as charged in indictment no. 98-0962, is reversed and dismissed.

## IV.  Sufficiency of the Evidence

The Appellant next contends the evidence was not sufficient for a rational trier of fact to find, beyond a reasonable doubt, all elements of the crimes of which the Appellant was convicted.  A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994).  Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992).

The Appellant concedes there is evidence to support his convictions; however, he argues that the evidence is insufficient when viewed against the "high standard enunciated in Jackson v. Virginia."  We disagree.  The Appellant confessed to all of the crimes for which he was convicted.  Sybil Clark identified  the Appellant as one of the robbers.  Robbery proceeds, a sawed-off shotgun, ski-masks, gloves, a Crossman air pistol, and ammunition were found in the Appellant's possession.  After review of the record, we find the proof sufficient to support the Appellant's convictions beyond a reasonable doubt for especially aggravated kidnapping, sixteen aggravated robberies, five aggravated burglaries, and two aggravated assaults.  Tenn. R. App. P. 13(e).

## V.  Consecutive Sentences

Fifth, the Appellant argues that the trial court erred by imposing consecutive sentences.  The Appellant received the maximum sentence for each conviction: ten years on each aggravated assault at 35 %; ten years on each aggravated burglary at 35%; thirty years on each aggravated robbery at 45%; and sixty years on each especially aggravated kidnapping at 100%.  The sentences within each episode were ordered to be served concurrently, but the total sentence for each criminal episode was run consecutively to the other episodes; for an effective two-hundred and seventy-year sentence.  *See* Appendix.  Specifically, the Appellant argues that he is not a dangerous offender because there is nothing in the record to indicate that he had little or no regard for human life or created an inordinate risk to human life.  Next, he argues that the trial court failed to articulate on the record any aggravating circumstances which would justify the imposition of consecutive sentences. Furthermore,  he contends that even if he is determined to be a dangerous offender, the facts and circumstances of this case do not support a finding that consecutive sentences are necessary in order to protect society and are reasonably related to the severity of the offenses.  The Appellant asks this court to order that the sentences for each criminal episode run concurrently for an effective sixty-year sentence.

With reference to the particular facts of this case, Tennessee Code Annotated § 40-35-115(b) (1997) provides that the sentencing court may order sentences to run consecutively if the court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is great." This court's review of the manner of service of a sentence is *de novo* with a presumption that the determination made by the trial court is correct. Tenn. Code Ann. § 40-35-401(d) (1997). Likewise, the Appellant bears the burden of proving the impropriety of the consecutive nature of the sentences imposed. Sentencing Commission Comments, Tenn. Code Ann. § 40-35-401(1997).

Before consecutive sentences can be imposed, the trial court must: (1) determine that one or more of the statutorily enumerated criteria of Tennessee Code Annotated § 40-35-115 exists, and (2) if the defendant is found to be a dangerous offender, find that the aggregate sentence is reasonably related to the severity of the offenses and is necessary to protect the public from further criminal activity of the offender. *State v. Wilkerson*, 905 S.W.2d 933, 936-38 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456 (Tenn. 1999) (holding *Wilkerson* factors were limited to sentencing of "dangerous offenders"). Notwithstanding proof of these criteria, a sentencing court retains the discretion of imposing consecutive sentences. Sentencing Commission Comments, Tenn. Code Ann. § 40-35-115 (1997). On appeal, the exercise of the sentencing court's discretion is afforded great weight, provided the court correctly applied the principles of consecutive sentencing. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Moreover, in determining whether the sentencing court providently exercised its discretion, "the overriding concern" is the fairness of the resulting sentence under all the circumstances. *State v. Sullivan*, No. M1999-02547-CCA-R3-CD (Tenn. Crim. App. at Nashville, Oct. 13, 2000); *see generally State v. Gray,* 538 S.W.2d 391 (Tenn. 1976).

In its sentencing decision, the trial court ordered the Appellant to serve consecutive sentences and reasoned in part as follows:

> [T]here is no question that his man is a dangerous offender. He has demonstrated that over and over. The conduct that he and his co-defendants engaged in – certainly the conduct that he engaged in was every citizen's nightmare to have to live through these types of home invasion kidnaping and robberies – whole families were herded into bathrooms and praying and clutching each other, hoping that they would live to see the next day. Elderly women had shotguns placed between their eyes. . . .
>
> This man is clearly a dangerous offender, who was on parole for these very offenses at the time – at the time he committed these offenses, has shown absolutely no remorse; and accordingly, I think it would be – I will run, concurrently, those cases, that are within each grouping. So for each of the – each of the families that were terrorized and robbed and kidnaped, those cases, within that grouping, will run

concurrently; but each of the separate groupings will run consecutively to one another.[2]

The Appellant argues that the trial court erred by finding that the Appellant was a dangerous offender within the meaning of Tennessee Code Annotated § 40-35-115(b) (1997). Specifically, the Appellant states, "[a]s serious as these offenses are, there is nothing in the record to indicate a display by Appellant of 'little or no regard for human life', or 'an inordinate risk human life' which would warrant consecutive sentences." We disagree. The Appellant committed seven violent robberies by threats, coercion, and force. During one robbery, the Appellant chased the victim until she stumbled and fell. In another robbery, the victim was hit on the head and knocked unconscious; during another robbery, a shotgun was placed between the victim's eyes; and also, in other robberies, victims were tied up with duct tape and forced into bathrooms or closets. Accordingly, we find that the trial court did not err by finding that the Appellant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is great."

Next, the Appellant contends that an "extended sentence [was not] necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences [were] not] reasonably relate[d] to the severity of the offenses committed." Specifically, the Appellant asserts that:

> If Appellant received concurrent sentences, his effective sentence would still be 60 years at 100% on the especially aggravated kidnappings. He was 27 at the time of sentencing, and already facing close to 2 years remaining on his previous sentence, for which his parole was violated. That would place him in prison past his 89th birthday. . . . Clearly, consecutive sentences totaling 270 years are not necessary to protect society. And such an unnecessarily long sentence surely does not reasonably relate to the severity of the offenses committed. It exceeds the life span of a human being, and is, clearly, effectively greater than a life sentence.

This argument has been repeatedly rejected. "The power of a trial judge to impose consecutive sentences ensures that defendants committing separate and distinct violations of the law receive separate and distinct punishments. Otherwise defendants would escape the full impact of punishment for one of their offenses." *State v. Robinson*, 930 S.W.2d 78, 85 (Tenn. Crim. App. 1996) (citing *Frost v. State*, 336 Md. 125, 647 A.2d 106, 115 (1994)) (defendant received consecutive life sentences for two first-degree murder convictions); *see also State v. Pike*, 978 S.W.2d 904, 928 (Tenn. 1998); *State v. Black,* 815 S.W.2d 166, 170 (Tenn. 1991); *State v. Howell*,

---

[2]While the trial court determined only that the Appellant was a "dangerous offender," we find that the Appellant is also "an offender whose record of criminal activity is extensive." Tenn. Code. Ann. § 40-35-115(b) (1997). The Appellant began his criminal career at the age of eleven, when he was arrested for shoplifting. He was arrested at thirteen for the crime of burglary. He was again arrested at the ages of fifteen, sixteen, and seventeen for crimes such as burglary and grand larceny. His adult career began at nineteen, when he was convicted of first-degree burglary. The Appellant was later convicted of three counts of theft of property, criminal trespass, and aggravated robbery.

-13-

34 S.W.3d 484, 506-15 (Tenn. Crim. App. 2000); *State v. Ensley*, 956 S.W.2d 502, 514 (Tenn. Crim App. 1996). The Appellant committed seven violent robberies. The Appellant's past convictions, along with the present crimes, clearly reveal that the Appellant is an ongoing danger to the community. The Appellant should not escape the impact of consecutive sentencing merely because his crimes were determined as to merit the maximum sentence. *Robinson*, 930 S.W.2d at 85.

Sentencing is inescapably a human process that neither can nor should be reduced to a set of fixed and mechanical rules. *Wilkerson*, 905 S.W.2d at 938. The trial court imposed consecutive sentences for each of the seven criminal episodes, for an effective sentence of two-hundred and seventy years. Upon *de novo* review, we conclude that the imposition of consecutive sentences was appropriate, as the proof established that the aggregate sentence imposed is reasonably related to the severity of the offenses and was necessary to protect the public from further criminal acts of this Appellant. Accordingly, this issue is without merit. However, because we have previously vacated one of the Appellant's especially aggravated kidnapping convictions, the Appellant's sentence will be reduced to an effective two-hundred and forty years. *See* Appendix.

## CONCLUSION

Based upon the foregoing, we conclude that the trial court erred in joining the eight separate criminal episodes for trial; however, such error was harmless. We also find that the Appellant's multiple convictions for both especially aggravated kidnapping and aggravated robbery involving the victim Larry Smith (January 6th episode) violate due process principles and the mandate of *State v. Anthony*. Accordingly, the Appellant's conviction for especially aggravated kidnapping and accompanying sentence in indictment no. 98-0962 is reversed and dismissed, resulting in an effective sentence of two-hundred and forty years. In all other respects, the Appellant's judgments of convictions and sentences are affirmed. This case is remanded to the trial court for a corrected judgment of conviction in indictment no. 98-0962 consistent with this opinion.

_____
DAVID G. HAYES, JUDGE

**APPENDIX**

December 4, 1997

| Indictment No. | Victim | Offense | Class | Sentence Imposed |
|---|---|---|---|---|
| 98-09660 | Classie Anderson | Aggravated Burglary | C | 10 years at 35% |
| 98-09661 | Michael Coleman | Aggravated Robbery | B | 30 years at 45% |
| 98-09662 | Linda Anderson | Aggravated Robbery | B | 30 years at 45% |
| 98-09663 | Classie Anderson | Aggravated Robbery | B | 30 years at 45% |
| 98-09664 | Debbie Anderson | Aggravated Robbery | B | 30 years at 45% |

December 23, 1997

| Indictment No. | Victim | Offense | Class | Sentence Imposed |
|---|---|---|---|---|
| 98-09636 | Corrine Coleman | Aggravated Robbery | B | 30 years at 45% |
| 98-09637 | Corrine Coleman | Aggravated Burglary | C | 10 years at 35% |
| 98-09638 | Kecia Coleman | Aggravated Robbery | B | 30 years at 45% |
| 98-09639 | Kecia Coleman | Especially Aggravated Kidnapping | A | 60 years at 100% |
| 98-09641 | Carmen Coleman | Aggravated Robbery | B | 30 years at 45% |

December 27, 1997

| Indictment No. | Victim | Offense | Class | Sentence Imposed |
|---|---|---|---|---|
| 98-09642 | Willester Clark | Aggravated Robbery | B | 30 years at 45% |
| 98-09643 | Willester Clark | Aggravated Burglary | C | 10 years at 35% |
| 98-09644 | Jean Clark | Aggravated Robbery | B | 30 years at 45% |
| 98-09645 | Menthia Clark | Aggravated Robbery | B | 30 years at 45% |
| 98-09646 | Sybil Clark | Aggravated Robbery | B | 30 years at 45% |
| 98-09647 | Leslie Clark | Aggravated Robbery | B | 30 years at 45% |

January 3, 1998

| Indictment No. | Victim | Offense | Class | Sentence Imposed |
|---|---|---|---|---|
| 98-09654 | Lindsey Wilson | Aggravated Assault | C | 10 years at 35% |
| 98-09655 | John White | Aggravated Robbery | B | 30 years at 45% |

January 6, 1998

| Indictment No. | Victim | Offense | Class | Sentence Imposed |
|---|---|---|---|---|
| 98-09629 | Larry Smith | Especially Aggravated Kidnapping | A | 60 years at 100% |
| 98-09630 | Larry Smith | Aggravated Robbery | B | 30 years at 45% |
| 98-09631 | Larry Smith | Aggravated Burglary | C | 10 years at 35% |

January 14, 1998

| Indictment No. | Victim | Offense | Class | Sentence Imposed |
|---|---|---|---|---|
| 98-09648 | Zernia Peacock | Aggravated Burglary | C | 10 years at 35% |
| 98-09649 | Zernia Peacock | Aggravated Robbery | B | 30 years at 45% |

Later January 14, 1998

| Indictment No. | Victim | Offense | Class | Sentence Imposed |
|---|---|---|---|---|
| 98-09653 | John Ables | Aggravated Assault | C | 10 years at 35% |
| 98-09669 | Teresa Davis Wampler | Aggravated Robbery | B | 30 years at 45% |